## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

VERSO PAPER CORP., and               Case No. 1:14-cv-2216 (TSC)
NEWPAGE HOLDINGS INC.,

                Defendants.

## RESPONSE OF PLAINTIFF UNITED STATES TO
## PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT

Pursuant to the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), the United States hereby responds to the public comments received regarding the proposed Final Judgment in this case.  After careful consideration of the submitted comments, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint.  The United States will move the Court for entry of the proposed Final Judgment after the public comments and this response have been published in the *Federal Register* pursuant to 15 U.S.C. § 16(d).[1]

---

[1] On May 7, 2015, the United States submitted its Unopposed Motion and Supporting Memorandum to Excuse *Federal Register* Publication of Attachments to Public Comments requesting that this Court authorize an alternative means for publishing the attachments to the public comments received in this action.  (Docket No. 11.)

## I.     PROCEDURAL HISTORY

On January 3, 2014, Verso Paper Corp. ("Verso") entered into an agreement to acquire NewPage Holdings Inc. ("NewPage") in a transaction valued at approximately $1.4 billion.[2]  The United States filed a civil antitrust Complaint on December 31, 2014, seeking to enjoin Verso from acquiring NewPage.  The United States alleged in its Complaint that the acquisition likely would substantially lessen competition in the sale of coated freesheet web paper, coated groundwood paper, and label papers to customers in North America in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  At the time the Complaint was filed, Verso and NewPage were vigorous competitors in these coated paper markets.

Simultaneously with the filing of the Complaint, the United States filed a proposed Final Judgment and a Stipulation signed by Plaintiff and Defendants consenting to entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act, 15 U.S.C. § 16, and a Competitive Impact Statement ("CIS") describing the transaction and the proposed Final Judgment.  The United States published the proposed Final Judgment and CIS in the *Federal Register* on January 14, 2015, *see* 80 Fed. Reg. 1957, and caused summaries of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, to be published in *The Washington Post* on January 14, 15, 16, 19, 20, 21, and 22, 2015.  The 60-day period for public comment ended on March 24, 2015.  The United States received two comments, as described below and attached hereto as Exhibits 1 and 2.

---

[2] After the United States initiated this action on December 31, 2014, Verso Paper Corp. changed its name to Verso Corporation.

## II.     THE INVESTIGATION AND THE PROPOSED RESOLUTION

The proposed Final Judgment is the culmination of a nearly year-long investigation by the Antitrust Division of the United States Department of Justice ("Department") of the proposed transaction.  As part of its investigation, the Department issued 19 Civil Investigative Demands for documents and information to third parties, collected almost one million documents from the Defendants and third parties, interviewed more than 100 customers, brokers, and competitors in the relevant coated paper markets, deposed 12 Verso and NewPage employees, and consulted with industry experts.  The Department carefully analyzed the information it obtained from these sources and thoroughly considered all of the issues presented.

The Department found that the proposed acquisition would likely have eliminated substantial head-to-head competition in the relevant markets between Verso and NewPage, providing the combined firm with an incentive to raise prices and reduce output.   The Department also found in the coated freesheet web paper and coated groundwood paper markets that the transaction would have likely caused the remaining players to accommodate one another's price increases and output reductions.  Overall, the Department concluded that if Verso and NewPage had completed the proposed transaction as structured, the loss of competition likely would have resulted in higher prices to consumers.  For these reasons, the Department filed a civil antitrust lawsuit to block the merger and alleged that the proposed transaction violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

The proposed Final Judgment eliminates the anticompetitive effects identified in the Complaint by requiring Defendants to divest NewPage's Rumford, Maine and Biron, Wisconsin paper mills and related assets (collectively, "the Divestiture Assets") to Catalyst Paper Corporation ("Catalyst") on terms acceptable to the United States.  The divestitures eliminate the

anticompetitive effects of the transaction by transferring the Rumford and Biron paper mills to a vigorous and independent competitor and preserving the pre-merger market structure in the coated freesheet web paper, coated groundwood paper, and label paper markets.

Since the United States submitted the proposed Final Judgment on December 31, 2014, Verso has acquired NewPage, and Catalyst has acquired and is operating the Divestiture Assets.

## III.      STANDARD OF JUDICIAL REVIEW

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day public comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)      the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)      the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see also United States v. SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1, 10-11 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, No. 08-cv-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009)

(discussing nature of review of consent judgment under the Tunney Act; inquiry is limited to "whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable").

Under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the Complaint, whether the decree is sufficiently clear, whether the enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft,* 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.,* 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir. 1981)). Instead, courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement in "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel,* 648 F.2d at 666 (emphasis added) (citations omitted).

In determining whether a proposed settlement is in the public interest, "the court 'must accord deference to the government's predictions about the efficacy of its remedies.'" *United States v. U.S. Airways Grp., Inc.,* 38 F. Supp. 3d 69, 76 (D.D.C. 2014) (quoting *SBC Commc'ns,* 489 F. Supp. at 17). *See also Microsoft,* 56 F.3d at 1461 (noting that the government is entitled to deference as to its "predictions as to the effect of the proposed remedies" ); *United States v. Archer-Daniels-Midland Co.,* 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should

grant due respect to the United States' "prediction as to the effect of the proposed remedies, its perception of the market structure, and its views of the nature of the case"); *United States v. Morgan Stanley*, 881 F. Supp. 2d 563, 567-68 (S.D.N.Y. 2012) (explaining that the government is entitled to deference in choice of remedies).

Courts "may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17. Rather, the ultimate question is whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461. Accordingly, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17. And, a "proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is within the reaches of the public interest." *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations and internal quotations omitted); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

In its 2004 amendments to the Tunney Act,[3] Congress made clear its intent to preserve the practical benefits of using consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The procedure for the public interest determination is left to the discretion of the

---

[3] The 2004 amendments substituted "shall" for "may" in directing relevant factors for courts to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of the Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11; *see also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) ("[T]he Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to public comments alone.").

## IV. SUMMARY OF PUBLIC COMMENTS AND THE UNITED STATES' RESPONSE

### A.      Summary of the Public Comments

During the 60-day comment period, the United States received two comments regarding the proposed Final Judgment, although no comments were received from any printer, publisher, or other paper customer.  The only comments were made by former employees of the now closed Bucksport, Maine paper mill.  Verso produced coated groundwood and specialty paper products at the Bucksport mill until closing the mill in December 2014 and selling it to AIM Development (USA) LLC ("AIM").  AIM is the U.S. subsidiary of American Iron & Metal, Inc., a company that purchases discontinued manufacturing facilities and salvages the metal.  Both comments focus upon competition in the coated groundwood paper market and the closure of the Bucksport mill.

Local 1821 of the International Association of Machinists and Aerospace Workers ("Local 1821"), consisting of 58 former employees of the Bucksport mill, submitted a comment arguing that: (1) the divestitures provided by the proposed Final Judgment are inadequate to redress the merger's anticompetitive effects and should have included the Bucksport mill; (2) Catalyst is an insufficiently independent and vigorous competitor and should not have been selected as the buyer of the Divestiture Assets; (3) recent price increases by Verso and Catalyst demonstrate the failure of the proposed Final Judgment to remedy the transaction's

anticompetitive effects; and (4) the United States should have investigated alleged anticompetitive conduct that Verso's parent company, Apollo Capital Management ("Apollo"), has engaged in since at least 2011, including efforts to buy NewPage, acquiring NewPage's debt to influence its business operations, and causing Verso and NewPage to shut down mills in order to reduce output and raise prices.  Local 1821 further argues that the Department should open an investigation into whether the sale of the Bucksport mill to AIM violated Section 1 of the Sherman Act.

Herbert R. Gilley also submitted a comment.  Mr. Gilley, who is not a member of Local 1821, worked at the Bucksport mill for more than 38 years before losing his job when the mill closed.  In his comment, Mr. Gilley similarly contests the closure and sale of the Bucksport mill and argues that the closure was anticompetive and will result in reduced output and higher prices.

> **B.     The United States' Response to the Public Comments**
>
> > **1.     The Divestiture Assets Are Sufficient to Remedy the Harm Alleged in the Complaint**

Local 1821 and Mr. Gilley argue that the required divestitures are not sufficient to prevent the merger's anticompetitive effects and assert that additional paper mills, including Verso's Bucksport mill, should have been included in the divestiture package.  But the required divestitures essentially preserve the preexisting competitive structure of the affected coated paper markets by providing Catalyst with approximately the same capacity as Verso had prior to the merger.  The divested Rumford and Biron mills produced approximately 940,000 tons per year of coated publication papers, label paper, and other papers, which is approximately the same amount of production capacity that Verso had after closing the Bucksport mill but before acquiring NewPage.  In the coated groundwood market in which the Bucksport mill competed, the output of the divested mills actually exceeds the output of the assets Verso held after it closed

the Bucksport mill and before it completed the merger.  In fact, the Biron mill alone produces more coated groundwood than Verso's remaining coated groundwood production assets. Furthermore, both the Rumford and Biron mills have a strong track record of competitively producing a range of coated publication papers and label paper, and Catalyst's ownership of the mills will give it a market presence comparable to Verso's pre-merger market presence in the relevant markets.  *See also* Competitive Impact Statement at 11.  For these reasons, the Department concluded that Verso's divestiture of the Rumford and Biron mills sufficiently redressed the merger's competitive harm.

Local 1821 and Mr. Gilley assert that the Department should have required Verso to divest the Bucksport mill.  But, as discussed above, the Department concluded that the required divestitures would sufficiently preserve competition, making the divestiture of the Bucksport mill unnecessary.  *See US Airways*, 38 F. Supp. 3d at 75-76 (explaining that the government is entitled to deference in choice of remedies); *United States v. Abitibi Consol. Inc.,* 584 F. Supp. 2d 162, 166 (D.D.C. 2008) (rejecting claim that paper mill divestiture was too small because the government had factual basis for concluding that a single mill divestiture was adequate).

The Bucksport mill, moreover, was less viable than the mills included in the Divestiture Assets.  The Department carefully reviewed evidence related to the Verso mills, including Verso's plans relating to the Bucksport mill that pre-dated the merger and deposition testimony of senior Verso executives about the future of the Bucksport mill.  Based on this evidence, the Department concluded that Verso closed the Bucksport mill because the mill was not profitable and that the merger did not cause the mill's closure.[4]

---

[4] Consequently, the closure of the Bucksport mill is not an anticompetitive effect of Verso's acquisition of NewPage.  *See also* Competitive Impact Statement at 3 n.1.

Notably, Local 1821 made many of the same antitrust arguments about the Bucksport mill in a recent – and unsuccessful – lawsuit it brought to enjoin Verso's sale of the Bucksport mill to AIM.  On December 15, 2014, Local 1821 filed a civil action in the United States District Court for the District of Maine alleging that the pending sale violated federal and state antitrust laws.  *See Int'l Ass'n of Machinists and Aerospace Workers v. Verso Paper Corp.,* No. 1:14-cv-00530 (JAW), ___ F. Supp. 3d ___, 2015 WL 248819, at *8-*34 (D. Me. Jan. 20, 2015) (attached as Exhibit 3).  After extensive briefing and oral argument, the Court rejected Local 1821's motion for a preliminary injunction and temporary restraining order, concluding in a 73-page opinion that Local 1821 had not "met its burden to prove a strong likelihood of success on the merits of their claims under federal antitrust law."  *Verso Paper*, 2015 WL 248819, at *73.

## 2.      Catalyst Is an Appropriate Buyer for the Divested Assets

Local 1821 asserts that Catalyst is not an appropriate buyer for the Divestiture Assets because it is insufficiently vigorous and independent to compete with Verso.  However, Catalyst operated three paper mills in British Columbia, Canada, before it acquired the Divestiture Assets and the Department thoroughly examined Catalyst before approving it as the purchaser of the Divestiture Assets.  The Department carefully reviewed the proposed transaction, Catalyst's plans to compete in the relevant markets, and the transitional agreements between Verso and Catalyst.[5]  Based upon this review, the Department concluded that Catalyst would be a vigorous and independent competitor.

---

[5] While Catalyst recently emerged from bankruptcy, bankruptcy reorganization is a fairly common occurrence in the paper industry and not a sign that Catalyst will not be an effective competitor.  *See, e.g.*, Judy Newman, *NewPage Corp. Emerges from Chapter 11 Bankruptcy*, Wis. State J., Dec. 12, 2012, *available at* http://host.madison.com/business/newpage-corp-emerges-from-chapter-bankruptcy/article_d31c8f88-4bc8-11e2-9164-001a4bcf887a.html (discussing NewPage's emergence from bankruptcy); Press Release, AbitibiBowater, *AbitibiBowater Emerges from Creditor Protection* (Dec. 9, 2010), *available at* http://www.newswire.ca/en/story/586251/abitibibowater-emerges-from-creditor-protection.

**3.      Verso's and Catalyst's Recent Announcements of Price Increases Do Not Show that the Department's Proposed Remedy Is Inadequate**

Local 1821 notes that Verso and Catalyst each announced price increases in January 2015 and argues that these announced price increases demonstrate that the divestiture is inadequate. But Local 1821 has not offered any evidence that the price increases arise from or are connected to the merger.  To the contrary, the price increases likely are related to a number of factors, including input costs, demand fluctuations, and recent and significant capacity reductions in the coated groundwood market that are unrelated to the merger.  In addition to Verso's Bucksport mill closure, coated groundwood paper producer Futuremark also closed its Alsip, Illinois coated groundwood mill in August 2014.  *See* Press Release, FutureMark Alsip, *FutureMark Alsip to Idle Mill* (Aug. 21, 2014), *available at* http://www.businesswire.com/news/home/20140821005972/en/#.VUjFcv-Jiig ("FutureMark Alsip [] today announced that, due to increasingly challenging market conditions in the North American coated paper market, it will indefinitely idle its mill in early September.").

**4.      Local 1821's Allegations that Other Conduct by Apollo and Verso Violated the Antitrust Laws Are Outside the Scope of the Tunney Act**

Lastly, Local 1821 alleges that Apollo, Verso's parent company, has engaged in anticompetitive conduct since at least 2011 and argues that the Department should have investigated these earlier activities.   Local 1821 also asserts that the Department should investigate whether Verso's 2015 sale of the Bucksport mill to AIM violates Section 1 of the Sherman Act.

Although the Department takes all allegations of anticompetitive conduct seriously, Local 1821's claim that the United States should bring or have brought an enforcement action relating to conduct not challenged in the Complaint is outside the scope of this Tunney Act proceeding.

It is well-settled that the Department's decision to bring an action alleging harm is left to the Department's prosecutorial discretion and is not part of the court's Tunney Act review.  *See Microsoft*, 56 F.3d at 1459 (explaining that in an APPA proceeding, the "district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree itself").  Indeed, this Court has squarely held that "a district court is not permitted to 'reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made.'"  *SBC Commc'ns*, 489 F. Supp. 2d at 14 (quoting *Microsoft*, 56 F.3d at 1459) (emphasis in original); s*ee also US Airways*, 38 F. Supp. 3d at 76.  Consequently, Local 1821's allegations of anticompetitive conduct not challenged in the Complaint do not provide a basis for rejecting the proposed Final Judgment.

## V.  CONCLUSION

After reviewing the public comments, the United States continues to believe that the proposed Final Judgment, as drafted, provides an effective and appropriate remedy for the antitrust violations alleged in the Complaint, and is therefore in the public interest.  The United States will move this Court to enter the proposed Final Judgment after the comments and this response are published in the *Federal Register*.

Dated: May 18, 2015

Respectfully submitted,


/s/ Karl D. Knutsen
Karl D. Knutsen
Richard Martin
Garrett M. Liskey (D.C. Bar No. 1000937)
Attorneys for the United States
Litigation I Section
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 4100
Washington, DC  20530
Telephone: (202) 514-0976
Facsimile: (202) 305-1190
E-mail: karl.knutsen@usdoj.gov